# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN TUNG, | ) |
|         Plaintiff, | ) |
| v. | ) Case No. 14-CV-4699 |
| MICHAEL SEARS, | ) |
|         Defendant. | ) |

## COMPLAINT

Plaintiff John Tung, through his undersigned counsel, brings this Complaint against Defendant Michael Sears and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. This action arises out of Defendant Michael Sears's refusal to distribute the portions due of a $14.7 million whistleblower award issued by the SEC to Tung and another colleague, an award which was received as a result of their joint efforts and investigation and which was intended and agreed to be distributed among the partners in this joint venture.

2. Plaintiff John Tung ("Tung"), an individual, is an Illinois citizen and domiciled in Lake Forest, Illinois.

3. Defendant Michael Sears ("Sears"), an individual, is a Virginia citizen and domiciled in Alexandria, Virginia.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds $75,000.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial portion of

the events giving rise to the action arose here.

## FACTUAL BACKGROUND
### Allegations Common to All Counts

*The Parties and Their Business Partnerships*

6. Tung and Sears have worked together in businesses which they co-owned and co-managed starting in 2002, and were joined by a third person, Michael Kolodner ("Kolodner") in 2005 in these businesses.

7. The two companies in which Tung and Sears are currently engaged are Capital Area Regional Center Job Fund, LLC ("CARc") and Global Capital Markets Advisors, LLC ("GCMA"). (CARc and GCMA are collectively referred to herein as "the Companies".) Both are Delaware companies and were formally incorporated in March 2007. Plaintiff Tung, through an entity known as MBJ Management LLC, is a founding Member and Manager of both companies and holds a 45% share in each business. Defendant Sears, through an entity known as Sears Family LLC, is also a founding Member and Manager of both companies. Kolodner, through an entity known as Goose Hill Capital ("GHC"), is the third Member and Manager of CARc and GCMA and holds a 10% share in both.

8. CARc operates as a "designated Regional Center" under regulations issued by the US Citizenship & Immigration Services ("USCIS"), a division of the Department of Homeland Security. USCIS administers the Immigrant Investor Program, also known as "EB-5," which was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. Under the pilot immigration program authorized by Congress, certain EB-5 visas are set aside for investors in Regional Centers designated by USCIS for promoting economic growth.

9. CARc sponsors one or more real estate-oriented private investment funds

2

(collectively referred to herein as "the Fund") that are intended to qualify as eligible investments for foreign individuals seeking to apply for permanent residency visas under USCIC's EB-5 immigrant investor program.

10. GCMA is a real estate consulting and advisory business, and acts as the manager of several diversified real estate investment funds. GCMA is responsible for all operational matters relating to each fund, including marketing, administration, compliance, reporting, sourcing and selection of property investments, negotiations of all matters relating to each, and oversight of the investment portfolios. GCMA acts as the sole advisor to the Fund sponsored by CARc.

*The ACCC Fraud*

11. In early 2012, GCMA had a pending project known as "the Wharf Project" for which it was actively seeking investors. The Wharf Project was (and is) a large, multi-phase development covering twenty-seven acres of waterfront property in Washington, D.C. and was an EB-5 qualified Job Fund, making it an eligible investment for foreign individuals seeking to apply for permanent residency visas under USCIC's EB-5 immigrant investor program.

12. Part of GCMA's efforts to seek investors for the Wharf Project was to market the project to foreign investors in China, where GCMA maintained a business office and several employees. Foreign investors in China often worked through local agents (referred to herein as "investor agents"), who acted essentially as "matchmakers" and sought to match up investors in China with various EB-5 qualified projects marketing their investment opportunities to Chinese investors.

13. In or around March 2012, Sears, Tung and Kolodner, through their work on behalf of the Companies, became aware of a competing entity marketing and selling an

3

investment opportunity to investor agents and investors in China for a convention center development project based in Chicago, Illinois. The competing entity fronting the Chicago convention project was doing business under two names: "A Chicago Convention Center" and "Intercontinental Regional Center Trust of Chicago" (collectively "ACCC" herein). Similar to the Wharf Project, ACCC operated as and marketed an investment scheme targeted toward individuals seeking permanent residency under the federal EB-5 program.

14. To market the Wharf Project, Sears travelled to China as part of GCMA's marketing function. GCMA planned the marketing trips to China to seek investors for their project.

15. Sears, while present in China, learned from various investor agents of ACCC's marketing efforts and proposed investment project. The investor agents advised that the Chicago convention project was paying higher rates to investors and promising better investment returns, and thus was a more attractive opportunity for investors.

16. Sears, upon learning this information, informed Tung and Kolodner of ACCC's marketing pitches and investment promises, as part of their regular business discussions and to discuss the effect on GCMA's marketing. Thereafter, Sears, Tung and Kolodner spoke regularly by phone during Sears's marketing trips to China and exchanged numerous emails about the work being done and information being learned.

17. The information initially available to Sears, Tung and Kolodner relating to ACCC's Chicago convention project suggested that the project related to a Chicago-area hotel purportedly under construction.

18. As more information became available regarding ACCC's marketing, however, Sears and Tung suspected that ACCC was misrepresenting or overpromising the progress of

4

the Chicago convention project. Sears and Tung also believed that ACCC was conducting business in an unfair manner, which was making it difficult for the Companies to compete in the market and recruit foreign investors.

19. Among other misconduct, ACCC was rumored to be making substantial payments to the "investor agents" to attract foreign investors for the Chicago convention project. Further, Sears and Tung believed that ACCC was misrepresenting to investors the progress of the purported hotel development.

20. By August 2012, Sears, Tung and Kolodner learned that ACCC was telling investors that the Chicago convention project had city approval, that groundbreaking and construction had begun, and that the center would be ready for occupancy by January 2014.

21. According to information provided to Sears, Tung and Kolodner, ACCC was also advising agents and investors that the Chicago convention center project was to include development of three hotels on three acres of land, and was purported to be a one billion dollar investment project. The development site for this alleged project was a former hotel property located within the City of Chicago on Higgins Road.

22. Tung suspected that ACCC was overstating its progress to developers or misrepresenting the truth. Tung, who lived and worked in the Chicago area, had not heard of any large scale convention center project under development, and suspected such rapid development was not possible. Tung also knew that completing the alleged project in Chicago within the timeframe promised by ACCC was likely impossible due to several factors, including the winter weather and the time needed for obtaining permits and other city approvals.

23. Tung shared and discussed his concerns with Sears and Kolodner, and Sears shared and discussed with Tung and Kolodner the information he was hearing from the agents in China. Based on their discussions, Tung, Kolodner and Sears all agreed that something "sounded wrong" with the Chicago convention project as it was being marketed at that time and all agreed to do further investigation of the facts relating to ACCC's project.

24. In particular, Sears, Tung, and Kolodner agreed that Tung and Kolodner, while Sears was in China, would investigate further by reviewing ACCC's marketing materials relating to the project, to help determine if ACCC was committing any legal violations.

25. They further agreed that Sears would utilize GCMA's staff in China to learn what information was being provided to agents and investors there. The additional investigation done by these staff members included gathering information from local agents on the specific representations ACCC was providing investors both verbally and in written materials relating to their project. The Companies paid the salaries of these employees.

*Approaching the SEC with their Information*

26. Based on the information they had jointly developed as set forth above, Sears, Tung and Kolodner agreed that Sears would start informal discussions with the SEC on behalf of all three regarding the suspected misconduct by ACCC. This occurred sometime in late October or November 2012.

27. After the initial contact to the SEC, Sears and Tung continued to develop information for the SEC relating to the ACCC project. Sears reached out to Tung by email on November 29, 2012, asking Tung to "go look up their project's…address [and] Do a drive by to see what's happening at the site, ie is there construction activity? Take some pictures too."

6

28. Sears indicated that he and Tung were to gather this information because the SEC wanted to "know what we know." Specifically, Sears advised Tung by email that "the SEC is investigating the [ACCC] offering and asked if we knew if 'construction' had begun as the marketing material has announced."

29. On or about November 29, November 30, and December 1, Tung made several visits to the purported site of the ACCC project, which Tung learned was to be located at or near 8201 W. Higgins Road, Chicago, Illinois. Tung visited several spots along Higgins Road to determine where ACCC's project could be in development. Tung also did additional internet research, including reviewing materials on ACCC's website, to identify the precise physical location being described by ACCC.

30. During his site visits, Tung saw that no substantial construction was underway at or near the proposed site; rather, Tung observed only some minor construction activities near the site, which were insufficient to meet the January 2014 occupancy date promised by ACCC. This information reinforced the partners' belief that ACCC was making fraudulent investment representations.

31. Tung took photos at this time of the alleged development site, confirming that no development was in progress. Tung shared those photos with Sears by email, in order for the photos to be provided to the SEC in support of the information they were providing to the SEC.

32. In late January or early February 2013, Sears provided an update to Tung and Kolodner on the status of the SEC's investigation, indicating that he had learned the SEC had initiated an investigation of ACCC for fraud.

33. On February 6, 2013, based on the information developed by Sears, Tung and

Kolodner, the SEC filed a complaint in the Northern District of Illinois against ACCC. The SEC also took steps to seize the more than $145 million obtained fraudulently from foreign investors. (The SEC's action is Case No. 13-CV-982, filed in this District.)

*The Whistleblower Report and Award*

34. In connection with the information they had provided the SEC, Sears advised Tung and Kolodner that, based on that information, they may be eligible and could apply for a monetary whistleblower award.

35. In discussions held in February 2013, Sears, Tung and Kolodner determined that they would apply for a whistleblower award with the SEC and that Sears, with the assistance of the Companies' attorney, would take the lead in preparing and submitting the application for such award (the "Application".) Sears, Tung and Kolodner discussed and understood that, upon receipt of any whistleblower award, all three would share division of the award, consistent with division of the Companies' profits.

36. Sears, in connection with the Application, utilized the services of their attorney, Ramsey Whitworth of Gebhardt & Smith. At all relevant times, and at least as of May 2012, Ramsey Whitworth had been retained by the Companies and was engaged in representing them in connection with the Wharf Project.

37. Tung and Kolodner understood that Mr. Whitworth had been engaged as the Companies' lawyer, to assist on behalf of all three partners in filing the Application.

38. Sears and their lawyer initially sought to file the whistleblower application on behalf of GCMA or the Companies.

39. Although the parties had initially anticipated that the SEC filing was to be made on behalf of GCMA, Sears thereafter told Tung and Kolodner that he learned the SEC rules did

not permit a corporation to file a whistleblower award application. Rather, Sears advised, the application needed to be submitted by an individual.

40. To conform to the SEC's regulations as represented by Sears, they agreed that Sears would submit the application in his name. In doing so, however, they did not change their understanding that Sears was acting on behalf of all three partners.

41. In September 2013, in view of the SEC's financial recovery and the information the three partners had gathered and provided to the SEC regarding the alleged fraud in the sale of securities committed by ACCC, the SEC confirmed a whistleblower award of $14.7 million.

*Sears Refuses to Distribute the Award to the Partners*

42. After receipt of the $14.7 million award, Sears turned on his partners, refusing to distribute to them any portion of the award, notwithstanding their common work in developing the information or their agreement and understanding that any award from the SEC was to be distributed to all three partners upon receipt.

43. During a phone call with Tung on or about September 12, 2013, Sears stated that he intended to keep the award for himself and that he would not distribute the award payment among them.

44. On or about September 12, 2013, Sears sent a memo to Kolodner and Tung confirming his intent to keep all of the Award proceeds to himself and not to distribute the proceeds according to the terms of their partnership. Rather, Sears advised them that he would be willing to make an interest bearing "loan" of less than one million dollars to the Companies, to be treated as "senior lien" on the income and assets of GCMA, and where the "loan" was to be used in part to pay unreimbursed expenses for himself.

45. In late September and October 2013, Tung and Kolodner discussed with Sears on

several occasions that they considered the SEC award to have been obtained on their joint behalf with knowledge and expertise provided by Kolodner and Tung and, as a result, should properly be distributed among the Members in accordance with the provisions of the Companies' agreements.

46. Sears continues to refuse to distribute the whistleblower award to Tung and Kolodner or to treat the award as a joint asset.

47. Ultimately, Sears and Kolodner reached a settlement in November or December 2014 by which Sears agreed to pay Kolodner an unknown lump sum cash payment to be paid in full by January 3, 2104. Based upon information and belief, Sears and Kolodner further agreed as part of this settlement, without Tung's input or vote, to allow Kolodner to receive monthly guaranteed payments and/or payment of legal fees to him from the Companies flowing from Sears' additional capital investment.

48. Neither Sears nor Kolodner has shared the settlement agreement with Tung, and he is being precluded from knowing the full terms of what Sears and Kolodner may have agreed to as it relates to the Companies' funding or assets used in connection with this settlement.

## COUNT I
### (BREACH OF FIDUCIARY DUTY)

49. Plaintiff repeats and re-alleges herein by reference the allegations contained in Paragraphs 1 through 48, above.

50. From late 2012 through early 2013, Sears, Tung and Kolodner agreed to investigate and gather evidence regarding the fraudulent activity and marketing efforts of GCMA's competitor, ACCC. The parties held a common interest in the investigation and submission of the award application and jointly directed and participated in it.

51. Tung, Kolodner and Sears, through their ownership in the Companies, bore

10

expenses associated with the investigation and related submission and agreed, prior to the time of receiving the SEC award, that any payment from the SEC would be distributed equitably among them, consistent with the terms of their partnership in the Companies.

52. Tung, Kolodner and Sears treated the investigation and report to the SEC as belonging to the joint enterprise, and agreed and understood that Sears's interaction with SEC was on behalf of all three venturers.

53. Tung, Kolodner and Sears had an agreement, as evidenced by their actions, to carry out the investigation, reporting and award application on behalf of all three partners.

54. Tung, Kolodner, and Sears intended to be joint venturers in this investigation, reporting to the SEC, and submitting the Application to the SEC, consistent with the terms of their partnership in the Companies.

55. Under Illinois law, a fiduciary relationship exists between these members of the joint venture, and joint venturers have a fiduciary duty to deal with each other with loyalty and good faith in regard to the enterprise.

56. Sears breached the fiduciary duties owed to Tung and Kolodner as his joint venturers in seeking and obtaining the whistleblower award from the SEC.

57. Sears represented to Tung and Kolodner that when he reported to the SEC and submitted the SEC award application, that he was acting on behalf of the partnership. He made such representations with the intent that Tung and Kolodner would rely upon them, as Plaintiff reasonably did.

58. Plaintiff suffered actual damage as a direct and proximate result of Sears's actions and breaches of his fiduciary duties, namely that he has been deprived the opportunity to share in direct payment and/or distribution of the proceeds awarded by the SEC. Tung is entitled to

restitution of his share of the $14.7 million award, and any future sums that may be awarded, in accordance with their joint venture and consistent with his 45% share as a member of the Companies.

WHEREFORE, Plaintiff prays the judgment be entered in his favor and against Michael Sears in at least the amount of $75,000, or such other amount as may be established at trial, and such other and further relief as the Court deems just.

## COUNT II
## (PROMISSORY ESTOPPEL)

59. Plaintiff repeats and re-alleges herein by reference the allegations contained in Paragraphs 1 through 58, above.

60. Defendant made an unambiguous promise to Tung and Kolodner, to act on their behalf as partners in filing the Application with the SEC and to distribute the whistleblower award among the partners in accordance with the terms of their partnership in the Companies upon receipt of any award.

61. Tung relied on such promise to his detriment, by foregoing the opportunity to contact the SEC himself and foregoing the opportunity to have his name also listed as a co-applicant on the Application when it was submitted to the SEC.

62. Tung's reliance was expected and foreseeable by Sears.

63. Sears lulled Tung and Kolodner into a false sense of security by leading Tung and Kolodner to believe that he was at all times acting on their collective behalf as partners of the Companies and for the Companies' benefit, including by his assertion that the whistleblower application had to be made by one individual person, indicating that he would submit the Application in his name in lieu of the Company name due to the SEC's rule, and using GCMA's corporate counsel to assist him in the process.

64. Making a report of the ACCC's fraudulent activities to the SEC was an important benefit to the partners and to the Companies, because of the competitive effect ACCC had on GCMA and its efforts to obtain foreign investors in the same marketplace. Further, the opportunity for the partners to obtain a substantial monetary award was also of benefit to the partners.

WHEREFORE, Plaintiff prays the judgment be entered in his favor and against Michael Sears in at least the amount of $75,000, or such other amount as may be established at trial, and such other and further relief as the Court deems just.

### COUNT III
### (BREACH OF IMPLIED CONTRACT)

65. Plaintiff repeats and re-alleges herein by reference the allegations contained in Paragraphs 1 through 64, above.

66. Plaintiff reasonably understood that Sears, based on the representations made by Sears and from his actions, had promised to act on behalf of all three partners in his dealings with the SEC and had promised to distribute equitably the SEC's whistleblower award in accordance with the terms of their business agreements. Sears held a 45 percent share of the Companies under their business agreements, Tung held a 45 percent share, and Kolodner held a 10 percent share.

67. In consideration of Sears's implied promises, neither Tung nor Kolodner pursued their own report or award application to the SEC, and forebore seeking to have their names individually included on the Application being submitted by Sears and the Companies' attorney.

68. Sears failed and refused to honor their agreement and refused to distribute the SEC's award to Tung and Kolodner. This refusal breached Sears's implied contract with Plaintiff.

13

69. As a direct and proximate result of Sears's breach of contract, Plaintiff has been damaged and has been denied his share of the SEC's award.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Michael Sears in at least the amount of $75,000, or such other amount as may be established at trial, together with Plaintiff's costs, and such other and further relief as the Court deems just.

### COUNT IV
### (CLAIM FOR ACCOUNTING AND CONSTRUCTIVE TRUST)

70. Plaintiff repeats and re-alleges herein by reference the allegations contained in Paragraphs 1 through 69, above.

71. By undertaking to file the Application on behalf of the venturers, Sears undertook fiduciary duties to Tung.

72. Sears has denied Tung information concerning his disposition of the funds received as a result of the Application, and Tung has no further information concerning the funds, their disposition, or the amounts distributed by Sears to himself or Kolodner despite demands for the same.

73. As a result, Tung lacks information necessary to prevent Sears from draining, misusing or moving such funds outside the reach of Tung or this Court and has no adequate remedy at law to remedy that lack of information.

74. Tung needs an accounting and discovery into the present whereabouts of the funds and how the funds are being preserved.

75. Tung is entitled to the imposition of a constructive trust over the funds in order to preserve his ability to recover the funds lawfully due to him.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Michael Sears in at least the amount of $75,000, that an accounting of the funds at issue be ordered, and that a constructive trust be placed on the funds until such time as judgment is entered in this action, and such other and further relief as the Court deems just.

### JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to all issues so triable.

### CONCLUSION

WHEREFORE, Plaintiff prays the judgment be entered in his favor and against Michael Sears in at least the amount of $75,000, or such other amount as may be established at trial, together with Plaintiff's costs, and such other and further relief as the Court deems just.

Dated: June 23, 2014

                                                                                JOHN TUNG

                                                         By: Sharon Doherty Sirott
                                                                 John C. Martin
                                                                 MARTINSIROTT LLC
                                                                 30 N. LaSalle Street, Suite 2825
                                                                 Chicago, IL 60602
                                                                 312-368-9000
                                                                 ssirott@martinsirott.com
                                                                 jmartin@martinsirott.com

                                                               *Attorneys for John Tung*