RECEIVED

FEB X 6 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | ) ) ) | |
| Plaintiff, | ) ) ) | 13CV982 JUDGE ST. EVE MAG. JUDGE ROWLAND |
| v. | ) ) ) | |
| A CHICAGO CONVENTION CENTER, LLC, ANSHOO R. SETHI, and INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) ) | |

### COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") brings this

civil law enforcement action against A Chicago Convention Center, LLC ("ACCC"),

Anshoo Sethi ("Sethi"), and Intercontinental Trust Center of Chicago, LLC ("IRCTC")

(collectively, "Defendants") to protect investors from potentially millions of dollars of

losses as a result of Defendants' violations of federal securities laws. In support, the SEC

alleges as follows:

1.     Over the past 18 months, Defendants have perpetuated a large scale

investment scheme to exploit a federal visa program as a means to defraud investors

seeking strong returns and a legal path to U.S. residency. Defendants fraudulently sold

over $145 million in securities and collected an additional $11 million in administrative



EXHIBIT
B

fees from more than 250 investors. These investors, however, were duped on the basis of false and misleading information supplied by Defendants.

2.　　　　The victims of this fraud are foreign nationals seeking a pathway to citizenship in the United States. The Immigration and Nationality Act of 1990 provided a method for foreign nationals to obtain U.S. residency by investing in domestic projects that will create or preserve a minimum number of jobs for U.S. workers. Known as the EB-5 Program and administered by U.S. Citizenship and Immigration Services (or "USCIS"), this program provides that foreign nationals may qualify to obtain a green card if the individuals invest $1,000,000 (or at least $500,000 in a "Targeted Employment Area" – *i.e.*, a high unemployment or rural area), creating or preserving at least 10 jobs for U.S. workers, excluding the investor and his or her immediate family.

3.　　　　Using the lure of gaining a pathway to U.S. citizenship through the EB-5 Program visa, Defendants targeted Chinese investors in a scheme to sell securities— interests in ACCC, an Illinois limited liability company—purportedly to finance and build the "World's First Zero Carbon Emission Platinum LEED certified" hotel and conference center in the Chicago area. To date, Defendants have convinced over 250 Chinese investors to wire a minimum of $500,000 apiece plus a $41,500 "administrative fee" to the Defendants' U.S. bank accounts.

4.　　　　Defendants, however, used false and misleading information to solicit investors in the purported hotel and conference center project. Defendants' December 13, 2011 Confidential Private Offering Memorandum (the "Offering Memorandum," attached hereto as Exhibit A), used to pitch investors, falsely claims, among other things, that

several major hotel chains have signed on to the Defendants' project, that Defendants have acquired all the necessary permits and approvals to construct the project, that the Defendants will contribute land valued at over $177 million to the project, and that the project is likely to generate over 8,000 jobs, thereby serving as a qualifying U.S.-based investment for purposes of the EB-5 Program.

5.      Defendants have also made materially false and misleading statements and provided falsified documents to USCIS in an attempt to secure USCIS's preliminary approval of the project and investors' provisional visas. Under the terms of Defendants' Offering Memorandum, investors' funds (excluding the $41,500 per subscription "administrative fee") are held in escrow and will only be released to Defendants based on USCIS's determination that the purported hotel project is capable of generating the minimum number of jobs to qualify under the EB-5 Program and adjudication of the individual investors' applications for a provisional visa (referred to as "I-526"), a preliminary step toward obtaining a green card in the future if the project succeeds in creating or saving the minimum amount of U.S. jobs.

6.      Such preliminary approval and granting of provisional visas—based upon false information supplied to USCIS—would result in releasing escrowed investor funds into the Defendants' control. Therefore, the fraud upon USCIS is a necessary part of the scheme to defraud investors and misappropriate investment funds.

7.      Further, Defendants have raised over $11 million in "administrative fees" in connection with their scheme. In their Offering Memorandum, Defendants claim that these fees are fully refundable to investors if investors' visa applications are rejected. However,

Defendants have already spent or dissipated **over 90%** of the administrative fees collected from investors, despite the purported promise to return these funds to investors if their visa applications are denied. Some of these funds were directed to Defendant Sethi's personal bank account in Hong Kong and have been misappropriated.

8. Through this action, the SEC seeks to protect the interests of current and future investors. As the fraud described is ongoing and is likely to continue, and over $145 million of investor funds remain at risk of being misappropriated, the SEC seeks emergency *ex parte* relief in this action to enjoin violations of the anti-fraud provisions of the federal securities laws, freeze assets, secure a preliminary injunction and other equitable relief.

**JURISDICTION AND VENUE**

9. The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

10. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

11. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15. U.S.C. §77 v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], as acts, practices and courses of business constituting violations alleged herein have occurred within the Northern District of Illinois.

12. Defendants directly and indirectly made use of the means and

instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

13.     Defendants have engaged in the sale of securities in the United States.

      a.     Investors are instructed to execute a subscription agreement (attached hereto as Exhibit B) and send to the Defendants in the U.S.;

      b.     Defendants—U.S. residents—have sole discretion whether to accept or reject an investor's subscription agreement;

      c.     Investors are instructed to wire funds to an escrow agent in the U.S.;

      d.     Investors are also instructed to execute subscription agreements for the purchase of shares of ACCC, a U.S.-based issuer; and,

      e.     Sales were not final until approved by the sponsors—residents of the United States—and the investors remit payment to a U.S.-based escrow agent.

## DEFENDANTS

14.     Anshoo R. Sethi ("Sethi"), age 29, is a resident of Illinois.

15.     A Chicago Convention Center, LLC, ("ACCC"), is an Illinois limited liability company with its principal office at 8201 W. Higgins Road, Chicago, IL 60631 and was formed on or about on January 24, 2011. Anshoo Sethi and Ravinder Sethi are its managing members. Anshoo Sethi is its agent.

16.     Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC") is an

5

Illinois limited liability company with its principal office at 8201 W. Higgins Road, Chicago, IL 60631 and was formed on or about on July 16, 2010. Sethi, Ravinder Sethi, and Ranjna Sethi are its managing members. Sethi is its agent.

17.      In June 2011, USCIS designated IRCTC as a Regional Center under the EB-5 Visa program, authorizing IRCTC to coordinate and sponsor EB-5 Program investment offerings.

18.      Sethi was the applicant for, and preparer of, IRCTC's application to USCIS for designation as a Regional Center under the EB-5 Visa program. Sethi is the primary representative of each company in their business dealings with USCIS and investors, and a signatory on ACCC and IRCTC bank accounts. Sethi controlled nearly every aspect of ACCC's and IRCTC's business, and asserted control over their actions.

19.      Defendants ACCC and IRCTC were alter egos of Sethi in that each had Sethi and Ravinder Sethi as managing members, the IRCTC bank account commingled assets of ACCC and IRCTC and other businesses and personal accounts related to the Sethi family, and the companies did not abide by corporate formalities. Sethi used the two entities interchangeably in carrying out the scheme alleged herein.

**THE ACCC CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

20.      The ACCC Confidential Private Offering Memorandum dated December 13, 2011 (the "Offering Memorandum" (Exhibit A)) offers to sell 499 Limited Liability Company Membership Interests (the "Interests") in ACCC to foreign investors for $500,000 each plus a $41,500 administrative fee. Each Interest constitutes 0.025% of the ownership of ACCC. The purpose of the offering is to raise $249,500,000 to help fund

IRCTC's project to build "a convention center and hotel complex, including convention and meeting space, five upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities."

21.     In addition to the $249,000,000 of anticipated total investments, the Offering Memorandum states that Defendants will raise additional funding for the project through: (1) the Defendants' contribution of the real estate site for the convention center (in their role as the project developer), which they value at more than $177,000,000, and (2) other funds that the Defendants plan to raise from bond offerings and tax credits. The project holds out the prospect that if it successfully creates or saves at least ten jobs per investor, then each foreign investor in the ACCC offering could receive permanent residency in the U.S. pursuant to the EB-5 Program.

22.     The Offering Memorandum expressly offers to sell "securities in a private placement" to "investors." The Offering Memorandum explains that the interests are offered and sold to Qualified Investors in reliance on an exemption from registration under the Securities Act.

23.     The Offering Memorandum identifies ACCC as the "offeror" of securities. It also identifies IRCTC as the "sponsor" of the convention center project that is the object of the securities offering.

24.     Investments began in November 2011 pursuant to the Offering Memorandum. While the defendants may have dated each investors' Offering Memorandum with a different date, for purposes of this Complaint, statements are based on a December 13, 2011 Offering Memorandum that an investor included as an exhibit to the

I-526 application that the investor filed with USCIS.

25.     Sethi is identified in the Offering Memorandum as (1) the contact person on the cover page, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives.

26.     Sethi has also provided the Offering Memorandum to one or more foreign sales agents, made presentations regarding the offering to investors in China, communicated with representatives of hotel chains, and had signing authority over the administrative account from which over $2.5 million was transferred to an account in his name in Hong Kong.

27.     Accordingly, Sethi had ultimate authority for making the materially false and misleading misstatements in the Offering Memorandum, and he, along with ACCC and IRCTC, are the makers of the false or misleading statements contained in the Offering Memorandum.

## THE OFFERING MEMORANDUM CONTAINS FALSE STATEMENTS OF MATERIAL FACT

### *Hotel Franchisors' Participation In The Project*

28.     The Offering Memorandum prominently features the participation of three major hotel chains in the project:  Starwood Hotels, Intercontinental Hotel Group, and Hyatt Hotels.  The Offering Memorandum explains:

> Hotels that *have executed franchise agreements* to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands) and Hyatt Place and Hyatt

8

Summerfield Suites (Hyatt Brands). . . . . Accordingly, the Project should benefit from hosting five brand-name reservation systems and three popular loyalty programs to feed the hotel properties. . . .

(Offering Memorandum, page 12 (emphasis added).)

29.     Then, a section of the Offering Memorandum titled "THE HOTEL BRAND ADVANTAGE" continues for ten pages incorporating large logos of the hotel chains and descriptions of their operations. The Offering Memorandum states that the Managing Member obtained these descriptions from the hotel chains. The Offering Memorandum states that Tower One will house the 17-story Element Hotel by Westin (a Starwood brand); Tower Two will house the 19-story Hotel Indigo and Staybridge Suites (both Intercontinental Hotel Group Brands); and Tower Three will house the 14-story Hyatt Place and Hyatt Summerfield Suites.

30.     Finally, the Offering Memorandum claims that, among other purportedly "already completed" key project milestones, "[f]ranchise agreements have been executed for the hotels to be located at the Project site."

31.     Defendants' statements regarding Starwood, Intercontinental, and Hyatt hotels are false and misleading. None of these hotel chains have executed franchise agreements with ACCC, IRCTC or Sethi and none had agreed to participate in the project described in the Offering Memorandum.

32.     Hyatt Hotels has never had an executed franchise agreement in place with Defendants (or any company affiliated with the Defendants). Further, a representative of Hyatt Hotels advised Sethi to refrain from making representations concerning Hyatt Hotels' involvement in the Project. Defendants did not disclose these material facts to USCIS or in the Offering Memorandum to investors.

33.     Although Intercontinental Hotels and Starwood Hotels had previously entered into franchise agreements with Sethi and companies affiliated with him (other than ACCC and IRCTC), these agreements were terminated well before Defendants began circulating their December 2011 Offering Memorandum to potential investors and selling the investments in the fall of 2011. In fact, these franchise agreements were terminated before ACCC was formed in January 2011.

34.     Intercontinental Hotels terminated its business relationship with Sethi (and his affiliated companies, Boutique Hospitality Investment, Inc. and Extended Hospitality, Inc.) as of July 7, 2010, nearly a year before IRCTC was granted status as a Regional Center under the EB-5 Program, more than a year before the Offering Memorandum was circulated to potential investors, and before either ACCC or IRCTC were formed. Defendants did not disclose these material facts to USCIS or in the Offering Memorandum to investors.

35.     Starwood Hotels terminated its relationship with Sethi and an entity related to him in 2009—more than two years before the Offering Memorandum was circulated to potential investors and well before either ACCC or IRCTC were formed. By September 14, 2009 and November 20, 2009, respectively, Starwood had terminated two licensing agreements that Defendants maintained with Starwood in connection with developing Element by Westin and Four Points by Sheraton hotel properties under the names of Upscale Hospitality, LLC and Upsliding, Inc. Starwood based the default and termination on the fact that Sethi and his associated entities, as licensees, failed to commence construction on the Element and Four Points properties by agreed upon dates and failed to

produce documents evidencing financing for the development of the hotels. Thus, Defendants misled investors about the relationship with Starwood and falsely stated that a franchise agreement with Starwood existed to locate a Starwood branded hotel at the Defendants' project. Defendants did not disclose these material facts to USCIS or in the Offering Memorandum to investors.

36.     In subsequent letters Starwood specifically directed Sethi, Upscale and Upsliding to cease representing that their properties were either one of the aforementioned Starwood brands immediately, including, but not limited to, in oral and written disclosures. Moreover, Starwood sought over $2.6 million in damages and fees as a result of breaches of the licensing agreements. Defendants did not disclose these material facts to USCIS or in the Offering Memorandum to investors.

37.     Although Starwood, Intercontinental and Hyatt Hotels did not have executed franchise agreements with any of the Defendants to participate in the hotel project described in the Offering Memorandum, Defendants provided to USCIS copies of letters from the hotel chains (Starwood and Intercontinental) purporting to indicate that Defendants and these hotel chains had entered into franchise relationships. They had not. Rather, the letters submitted by Defendants referred to franchise agreements that had been terminated. Defendants did not disclose that Starwood and Intercontinental had terminated their franchise relationship with Sethi and affiliated companies prior to submitting the letters to USCIS.

38.     Defendants also submitted to USCIS a letter purporting to be a "comfort letter" from Hyatt Hotels (on Hyatt Hotels' letterhead). Hyatt Hotels has informed the

11

SEC that the letter is not genuine. Rather, Sethi manipulated an electronic version of a form Hyatt Hotels comfort letter (that was unsigned and contained numerous blanks) to generate the letter provided to USCIS.

39.     Sethi used the Hyatt brand name, logo and letterhead despite being cautioned about his use of Hyatt Hotels' brand with the hotel project referred to in the Offering Memorandum. In the summer of 2012, after a Chinese investor contacted Hyatt to ask about its involvement in, and relationship with, the ACCC project, Hyatt advised Sethi to refrain from overstating Hyatt's involvement with the project.

### Completion of Prerequisites for the Project

40.     The Offering Memorandum states that, "Construction on the Project is scheduled to start in the summer of 2012, with occupancy of the first of the towers to begin in early spring of 2014." The Offering Memorandum adds that, "the Administrative Phase, covering the completion of the entitlement, design, civil engineering, permit securing, and fee payments for the Project property has been completed." The Defendants add that, "building permits were obtained by the Development Company and/or the Company." These statements are false or misleading.

41.     A search of the Chicago Building Permits database for the project address shows that the only recent permits are for a tent for a purported groundbreaking ceremony held in November 2012, a demolition permit, construction of a fence, and a minor electrical wiring permit.

*Value of the Land Contributed By Sponsors*

42.     The Offering Memorandum states that the defendants, as sponsors of the project, will contribute to the project a 2.8 acre parcel of land owned by an affiliate. The Offering Memorandum states that this property "recently has been separately appraised by both T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465." That statement was false and misleading.

43.     The January 19, 2011 Integra Report explicitly states that the report "**is not an appraisal and should not be construed as such**." (Emphasis added). Nor is the $177 million amount mentioned anywhere in the Integra Report. The Integra Report does not purport to (and does not) provide any current value for the property that the defendants intend to contribute to the Project.

44.     Other sources indicate that the purported $177 million valuation is vastly overstated. For example, property records indicate that the property was acquired by a company affiliated with Sethi in 2008 for less than $10 million. In addition, for tax purposes, the land value was assessed at $603,960. Further, a nearby 20 acre parcel of land with improvements sold for $7.7 million in 2011. For the foregoing reasons, the Offering Memorandum made a false and misleading statement of material fact in asserting that the property had been "appraised at a net valuation of $177,547,465."

*Sponsors' Background*

45.     The Offering Memorandum states that proposed management is critical to the success of the offering, and that the loss of ACCC's management company— Intercontinental Financial Group, LLC, a limited liability company formed, owned and

managed by Sethi and Ravinder Sethi—"could have a material adverse effect" on the

success of ACCC. The Offering Memorandum claims that Sethi, age 29, has "over fifteen

years of experience in real estate development and management, specifically in the lodging

area." This was a false and/or misleading statement of material fact.

46.     The Offering Memorandum omits any mention of the fact that Wyndham

Hotels & Resorts sued Sethi for failure to operate a Wyndham hotel in accordance with

Wyndham's monetary and quality assurance obligations, and that Sethi entered into a

consent judgment on a no-contest basis for violations of the wage and hour provisions of

the Fair Labor Standards Act, including failure to keep records of employee hours and

wages at the hotel.

47.     In addition, the Offering Memorandum misleadingly states that the project's

developer, Upgrowth, LLC, has "more than 35 years of experience," and a "reputation as a

premier nationwide hotel general contractor providing a full range of services to the

hospitality industry in both new construction and renovation for all hotel brands (including

Marriott, Starwood, Intercontinental Hotels Group, Choice Hotels, and Accor Hotels)."

However, Illinois corporate records show that Upgrowth was organized in 2010.

### *Backup Financing*

48.     The Offering Memorandum states that the Defendants would raise money

for the project from multiple sources in addition to the up-to $249,500,000 to be raised

from the foreign investors in the EB-5 Program. The Offering Memorandum cited

government financing as a major source of this additional funding. The Offering

Memorandum stated that:

14

The Project bond financing will consist of a bond-based energy efficiency "green" loan derived from tax exempt "moral obligation" bonds issued by the State of Illinois Finance Authority. The Project will qualify for such State of Illinois financing because of the commitment by the Project's principals to develop and operate the Project in a manner that results in quantifiable and verifiable reductions in energy usage. In addition, the Company believes it will be eligible for and able to obtain additional government bond financing through various other state and federal "energy and environmental" initiatives. For example, the Company expects to take advantage of United States Qualified Energy Conservation Bonds, which the Company can obtain via the State of Illinois acting as a conduit. The Company believes it will be able to raise an estimated $339,818,621 of loan proceeds derived from the various available federal and state bonds.

49. On June 7, 2012, USCIS sent Defendant ACCC a Request for Evidence of a commitment from the State of Illinois to provide financing. On December 4, 2012, counsel for Defendant IRCTC responded to the USCIS Request for Evidence and attached, among other things, a purported letter, dated September 27, 2012, from the Qatar Investment Authority (the "QIA Letter") which stated that the Qatar Investment Authority "is prepared to move forward with the funding of" $340 million for the Defendants' project, which IRCTC described to USCIS as "alternate financing" as a "backup" to the State of Illinois financing. Sethi countersigned the QIA Letter.

50. The Qatar Investment Authority has informed the SEC that the QIA Letter is not authentic and was not issued by or on the authority of the Qatar Investment Authority.

## USE OF THE ADMINISTRATIVE FEE

51. The Offering Memorandum and the subscription agreement instruct investors to pay an administrative fee of $41,500 that is fully refundable if the Defendants reject the subscription or if USCIS rejects the subscriber's I-526 Petition (an investor's preliminary visa application). According to the Offering Memorandum, the administrative

15

fees may be kept and used for the following: (1) legal, escrow and related expenses; (2) to reimburse the Managing Member and the LLC for the expenses of the offering; (3) to pay the Managing Member's fees; (4) to compensate the Managing Member for its efforts associated with setting up the LLC and conducting the offering; and (5) for marketing expenses or other fees to one or more consultants, brokers, public relation managers, investment advisors, or other parties in connection with the sale of interests pursuant to the offering.

52.     A preliminary analysis of ACCC's administrative account at SunTrust Bank indicates that the Defendants misappropriated a significant amount of the investors' administrative fee payments.  From November 28, 2011 to December 18, 2012, the ACCC's SunTrust bank account received 261 incoming wires of the $41,500 fee (or a similar amount) for total deposits of $10,726,466.  Funds are continuing to be wired into the account.  Between November 28, 2011 and December 18, 2012, the Sponsors made numerous wires out of the account, leaving a recent balance of less than $1 million.

53.     Between December 30, 2011 and December 10, 2012, there were at least 23 outgoing wires to an account in Sethi's name at HSBC Bank in Hong Kong.  The Originator to Beneficiary Information for seven of the wires (between May 11, 2012 and July 27, 2012) described these as payments as "Expenses."  Only one wire, on March 26, 2012, has Originator to Beneficiary Information that reads "For Investors."  For the most part these wires are for $100,000 or more and they typically occur several times a month.  On December 30, 2011, there was one large wire of nearly $500,000 to that account.  These wires total over $2.5 million dollars.

16

54.     In January and March 2012, ACCC transferred a total of $325,000 to IRCTC's bank account at Cathay Bank. In February of 2012, Sethi entered into a confidential settlement agreement with Wyndham to resolve Wyndham's lawsuit for various breaches of contract and violations of the License Agreement under which the Sethi operated a Wyndham Garden hotel at the project site. On May 29, 2012, Ravinder Sethi withdrew $35,000 cash from the IRCTC account and used that cash to fund a cashier's check in that amount to Wyndham. Based on that timing, the cashier's check drawn from the IRCTC operating account likely was intended to satisfy the terms of the settlement, an unauthorized use of investors' administrative fees.

## ECONOMIC ABILITY OF THE PROJECT TO CREATE JOBS

55.     The Defendants provided a business plan and two economic studies to USCIS to support their claim that the project will create or save enough U.S. jobs to qualify investors for green cards under the EB-5 Program. A review of those studies reveals several serious concerns about their truthfulness.

56.     First, the costs of the project are unusually high compared to hotel industry data. The business plan reports that the hard costs of the project will be $686,365,381 with an additional $48,589,790 in soft costs such as design and engineering for a total cost estimate of $734,955,171. This value represents a cost of $738,348 per room (key) and $421.3 per square foot. Defendants claim that the land is worth $177,547,465, which if included, raises the estimated cost per room to $917,088. However as of January 2012 full-service hotels (a step below luxury hotel) had an average total cost of only $212,300 per room. Luxury hotels had an average total cost of $610,500 per room. For a hotel

complex with 995 rooms, these values produce a cost estimate ranging from $211,238,500 to $607,447,500. Therefore, the projected total cost of the project and the cost per room exceed even the high-end averages.

57.     By overestimating costs, the employment projections would also be inflated based on the job estimation methodology used by Defendants to substantiate their job creation claims. These inflated costs, and hence inflated job creation numbers, would be material to prospective investors because the potential for investors to secure a visa hinges on the project creating or saving a minimum of 10 jobs per investor. Inflated numbers may mislead prospective investors by obscuring the fact that it is not feasible for the project to meet that minimum requirement. Overestimated costs and resulting inflated job creation numbers would also be misleading to USCIS.

58.     A survey of current hotel projects in the Chicago area from the T.R. Mandigo & Co. website lists the viability of the project, which it calls Platinum Chicago Convention Center, as "unlikely." In an August 2, 2012 T.R. Mandigo report on the O'Hare area in particular, it states:

> The site of the O'Hare Garden Inn on Higgins Road, between the Spring Hill Suites and the Marriott is the location of a planned 994 room platinum LEED hotel complex, called the Platinum Chicago Convention Center, including 4 separate brands, a 1,365 foot parking deck to meet zoning requirement and over 190,000 per square foot of common area shared meeting space. This project has been in planning stages since at least 2006, though has yet to get off the ground. The project is dependent on the international financing program currently pursued by the developer. *We do not anticipate that this hotel will open, for a number of reasons, not least of which is the staggering cost of the project.*

*See* http://trmandigo.com/static/ohare2012.pdf (emphasis added).

59.     These statements are particularly noteworthy because Mandigo, whose

research is cited throughout the Offering Memorandum, is identified in the Offering

Memorandum as a consultant for the project and as one of the appraisers of the land at the

project site.

60.     Defendants' projections of increased air traffic to O'Hare and room

occupancy data in their business plan and an economic analysis they retained are higher

than local and industry data.  For example, the projected room revenues for 2017 are

$105,077,000, which according to the construction time frame should result in all 995

rooms being ready for occupancy.  To achieve those room revenues, all 995 rooms would

need to be occupied every day of the year at a price of $289 per night. This calculation

would mean that the occupancy rates and prices would have to be even higher than the

optimistic projections used in the economic analysis.

61.     To the extent that the construction cost and revenue projections are both

inflated, that will dramatically impact the estimated job creation figures.  As job creation is

the key to EB-5 investors potentially receiving permanent residency, this fact would be

material to both investors considering the offering and to USCIS in their evaluation of the

project as a viable EB-5 enterprise for which investor funds should be released from

escrow.

### DEFENDANTS ACTED KNOWINGLY OR WITH RECKLESS DISREGARD FOR THE TRUTH OF MATTERS ASSERTED

62.     Defendants knowingly, or with reckless disregard for the truth, submitted

false documents to USCIS to make it appear that the Defendants' hotel project was a

qualifying domestic investment for purposes of the EB-5 Program.

63.     Defendants knowingly, or with reckless disregard for the truth, falsely

stated in the Offering Memorandum that major hotel chains have agreed to participate in

the Defendants' project and had executed franchise agreements with Defendants, that the

project had obtained all necessary approvals for construction, that the value of land

contributed by the Defendants for the project was valued at over $177 million.

64.     Defendants knowingly, or with reckless disregard for the truth, falsely

represented to USCIS that the Project was further along than it was by claiming that all

prerequisites for construction have been achieved.

65.     Defendants knowingly, or with reckless disregard for the truth, falsified a

document from Hyatt Hotels and informed USCIS and investors that Hyatt had agreed to

locate at the project site;

66.     Defendants knowingly, or with reckless disregard for the truth, falsified a

document from the Qatar Investment Authority and informed USCIS and, upon

information and belief, investors that Defendants have "backup" financing in the amount of

$340 million from the Qatar Investment Authority.

67.     Defendants also knew or were reckless in not knowing that the project

would never create enough jobs to qualify the investors for green cards, but they

nonetheless overstated the steps taken to develop the project in hopes of having the $145

million in escrow released to them.

68.     Defendants' scheme permitted them to obtain funds from investors,

including millions in administrative fees.

69.     Defendants knowingly, or with reckless disregard for the truth

misappropriated over $2.5 million of the investors' administrative fee payments, directing

these funds to Sethi's personal account, and used $35,000 of IRCTC's money to pay a prior judgment to Wyndham Hotels despite their promise to refund those the investor's administrative fees if USCIS rejected the investors' visa applications.

## COUNT I

### VIOLATIONS OF SECTION 17(a)(1) AND SECTION 17(a)(3) OF THE SECURITIES ACT

#### (Against Defendants Sethi, IRCTC and ACCC)

70.     Paragraphs 1 through 69 are re-alleged and incorporated by reference as though fully set forth herein.

71.     By engaging in the conduct described above, defendants Sethi, IRCTC and ACCC, in the offer and sale of securities, by the use of means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

72.     As detailed above, Defendants intentionally or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

73.     By reason of the foregoing, defendants violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), 15 U.S.C. § 77q(a)(3)].

## COUNT II

### VIOLATIONS OF SECTIONS 17(a)(2) OF THE SECURITIES ACT

#### (Against Defendants Sethi, IRCTC and ACCC)

74.     Paragraphs 1 through 73 are re-alleged and incorporated by reference as though fully set forth herein.

75.      By engaging in the conduct described above, defendants Sethi, IRCTC and ACCC, acting at least negligently, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.      As detailed above, Defendants have made false and misleading statements in the Offering Memorandum to investors.

77.      By reason of the foregoing, Defendants violated Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT RULE 10b-5

### (Against Defendants Sethi, IRCTC and ACCC)

78.      Paragraphs 1 through 77 are re-alleged and incorporated by reference.

79.      By engaging in the conduct described above, defendants Sethi, IRCTC and ACCC, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities. Further, defendants Sethi, IRCTC and ACCC made untrue statements of material fact and omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.      Defendants knew, or were reckless in not knowing, of the facts and circumstances described above.

81.      By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

**RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that this Court:

**I.**

Issue findings of fact and conclusions of law that defendants Sethi, IRCTC and ACCC committed the violations charged and alleged herein.

**II.**

Enter an order temporarily restraining and enjoining defendants Sethi, IRCTC and ACCC, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Exchange Act Rule 10b-5 [17 CFR 240.10b-5] thereunder.

**III.**

Enter an order freezing the assets of defendants Sethi, IRCTC and ACCC.

23

### IV.

Enter an order requiring defendants Sethi, IRCTC and ACCC to prepare a sworn accounting of all the money they have obtained from investors, including (1) a report on the disposition and current location of the money, and (2) disclosure of all bank and brokerage account numbers where they deposited the money.

### V.

Enter an order prohibiting the movement, alteration, and destruction of books and records to protect the books and records showing the location of assets and the disposition of their clients' money and to protect all remaining documents necessary for full discovery in this matter.

### VI.

Enter an order requiring defendants Sethi, IRCTC and ACCC to return to the United States any investors' funds that have been transferred abroad and that those assets which are returned be frozen in a domestic bank during the pendency of this action to preserve such assets for the satisfaction of disgorgement.

### VII.

Enter an Order of Permanent Injunction restraining and enjoining defendants Sethi, IRCTC and ACCC, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Exchange Act Rule 10b-5 [17 CFR 240.10b-5] thereunder.

## VIII.

Enter an Order requiring defendants Sethi, IRCTC and ACCC to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

## IX.

With regard to the defendants Sethi, IRCTC and ACCC's violative acts, practices and courses of business set forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## X.

Temporarily restrain and enjoin defendants Sethi, IRCTC and ACCC, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants from, directly or indirectly, (a) marketing or offering for sale to investors Limited Liability Company interests in ACCC; or (b) any other investments pursuant to the A Chicago Convention Center Private Offering Memorandum.

## XI.

Enter an Order of Permanent Injunction restraining and enjoining defendants Sethi, IRCTC and ACCC from, directly or indirectly, participating in, or facilitating, the solicitation of any investment in any security or in the offering of any security.

## XII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XIII.

Grant such other relief as this Court deems appropriate.

Dated: February 6, 2013

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: _____
Patrick M. Bryan (IL Bar No. 6277194)
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
BryanP@sec.gov

Charles J. Felker
Adam J. Eisner
Mika M. Donlon
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*