**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN TUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | Case No. 14-CV-4699 |
| **MICHAEL SEARS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO TRANSFER VENUE

Plaintiff John Tung respectfully submits this response in opposition to Defendant's Motion to Transfer Venue. As discussed below, Defendant's motion is premised on the false impression that Virginia has a substantial connection to this litigation or that some "corporate office" existed in Virginia, when the only witness and evidence located in Virginia is the defendant himself. In fact, this action arises out of communications to Plaintiff in this district about a fraud occurring in this district, and involves a whistleblower award generated by litigation filed in the Northern District of Illinois. The motion must therefore be denied.

## STATEMENT OF FACTS

This is an action, under Illinois law, for breach of contract and promissory estoppel. As set forth in the Complaint, the action arises out of Defendant Michael Sears's refusal to honor his agreement to his partners and distribute to Plaintiff John Tung ("Tung") his portions of a monetary whistleblower award made by the SEC following Tung and Sears's joint investigation of fraudulent activity here in Chicago (referred to as the "ACCC Chicago project").

Tung and Sears have, since 2002, been equal business partners (45% each) in two companies which they co-own and operate, Capital Area Regional Center Job Fund, LLC ("CARc") and Global Capital Markets Advisors, LLC ("GCMA") (collectively, "GCMA"), both

of which are engaged in EB-5 qualified real estate investments. (Complaint, ¶¶ 6-9.) Tung and

Sears have a third business partner, Michael Kolodner, who joined them in 2005 and is a 10%

partner. (Id., ¶¶ 6-7.) Indeed, while Defendant suggests that GCMA (or CARc) is headquartered

in Virginia (Def. Brf. at 3, 4), GCMA maintains only a mailing address in that state. (Tung Decl.,

¶¶ 4, 7.) From 2009 to the present, GCMA and CARc has maintained <u>no</u> physical office space in

any state. (Id.) Moreover, other than for a brief period of time in 2008-2009[1], GCMA and CARc

have <u>never</u> had a physical corporate office in *any* state. (Id., ¶¶ 4-7.) Since at least 2009, all three

partners have always worked from their respective home offices: John Tung in Illinois; Michael

Kolodner in New York, and Sears in Virginia. (Declaration of J. Tung, attached hereto as Exhibit

1, at ¶¶ 3, 5-6, 9.)

## I.     The ACCC Chicago Project

In March 2012, Sears, Tung and Kolodner became aware of an entity, ACCC, competing

with them for business by seeking investors in China relating to a proposed convention center

project here in Chicago, Illinois – the "ACCC Chicago Project." (Complaint, ¶¶ 13.) At that

time, GCMA had its own pending development project (the Wharf Project, an EB-5 qualified

Job Fund), which GCMA was marketing in China seeking foreign investors. (Id., ¶¶ 11-14.) On

behalf of GCMA, Sears often travelled to China as part of their marketing function (id., ¶ 14),

while Tung and Kolodner conducted their business on behalf of GCMA from Illinois and New

York, respectively. (Tung Decl., ¶¶ 9, 11.) While present in China in 2012, Sears learned that

ACCC was paying higher rates to investors and promising better investment returns for the

---

[1] For a short period of time in 2008-2009, GCMA maintained a physical office in Virginia that Michael Sears used for his purposes, before he began using his home office in Alexandria, Virginia to save costs. (Tung Decl. ¶ 6.) Other than during that time frame, GCMA and CARc have not had a physical corporate office, and maintain only an address for mailing purposes. (Id. ¶¶ 4, 7.)

ACCC Chicago Project. (Complaint, ¶ 15.) This directly affected GCMA's business to the extent that ACCC had a competitive advantage on GCMA's marketing and investment-raising efforts for its own EB-5 Wharf project. (Complaint, ¶¶ 16, 18; Tung Decl., ¶¶ 14, 16.)

Sears, during his trip to China, informed Tung and Kolodner of ACCC's marketing pitches and investment promises as part of their regular telephonic business discussions and to discuss the effect on GCMA's marketing. (Complaint, ¶16.) Sears, Tung and Kolodner all spoke regularly by telephone and exchanged numerous emails during 2012, each from their respective work locations –Tung in Illinois, Kolodner in New York, and Sears in China or Virginia. (Complaint, ¶ 16; Tung Decl., ¶¶ 9, 12, 15.) As more information became available regarding ACCC's marketing, Sears and Tung suspected that ACCC was misrepresenting the Chicago Project and operating in an unfair manner, impacting GCMA's marketing efforts and business. (Complaint, ¶ 18.) Tung, who lived and worked in the Chicago area, particularly suspected that ACCC was misrepresenting the truth since he had not heard of any large scale convention center project under development, and did not believe such rapid development was possible in the Chicago area. (*Id.*, ¶ 22.) All three partners agreed that something "sounded wrong" with the Chicago Project and agreed to do some more investigation. (Id., ¶ 23.) Accordingly, Tung (in Illinois) and Kolodner (in New York) undertook to review ACCC's marketing materials relating to the project for misrepresentations or other legal violations. (Id., ¶¶ 24-25.) All three continued to speak regularly by telephone and emails, from their respective individual offices. (Complaint, ¶¶ 26-27; Tung Decl., ¶¶ 9, 12, 14-15.)

## II.    <u>The SEC's Action against ACCC in Chicago</u>

By November 2012, based on the information they had all compiled, Tung and Sears agreed to take what they knew and suspected to the SEC. (Complaint, ¶ 26.) Sears was

effectively designated the point person, to communicate with the SEC on behalf of all three of the partners. (Id.; Tung Decl., ¶ 16.) Following the initial report, Tung's efforts and investigation here in Chicago, Illinois continued. (Complaint, ¶¶ 27-31; Tung Decl., ¶¶ 17-19.) Specifically, Sears and Tung discussed by email in November 2012 that "the SEC is investigating" the ACCC Chicago Project and asked "if *we* [Tung and Sears] knew if 'construction' had begun as the marketing material has announced." (Complaint, ¶ 27; Tung Decl., ¶ 17 and Exhibit A thereto.)

To gather more information for the SEC, Tung made several visits to the purported ACCC project site, located in Chicago, Illinois, between November 29 and December 1, 2012. (Complaint, ¶¶ 29-30; Tung Decl., ¶¶ 17-18.) Tung's site inspections in Chicago reinforced his belief that ACCC was making fraudulent investment representations. (Complaint, ¶ 30.) Tung also took several photos of the alleged development site, which confirmed that no development was in progress; these photos were taken specifically to be shared with the SEC. (Complaint, ¶ 31; Tung Decl., ¶ 17 and Exhibit A thereto.)

By late January February 2013, the SEC had initiated an investigation of ACCC for fraud and on February 6, 2013, based on the information developed by Tung, Sears, and Kolodner, the SEC filed a complaint in the Northern District of Illinois against ACCC and took steps in Chicago, Illinois to seize more than $145 million obtained fraudulently from foreign investors. (Complaint, ¶ 33.) The SEC's action against ACCC was filed in this District, before Judge St. Eve. See SEC v. A Chicago Convention Ctr. LLC, A. Sethi, and Intercontinental Reg. Ctr. Trust of Chicago LLLC, Case No. 13-CV-982 (the "Sethi Action").

## III.    The Application for the Whistleblower Award

Following the SEC's filing suit of the Sethi Action, and again as part of their regular telephone discussions, the partners agreed in February 2013 to apply for a whistleblower award

from the SEC. (Complaint, ¶¶ 34-35.) They agreed that the award application would be filed on behalf of GCMA with the assistance of GCMA's outside attorney, Ramsey Whitworth. (Id., ¶¶ 36-37.) When they learned that SEC rules did not permit a corporation to file an application, the partners agreed that Sears would submit the application in his name but that he would still be acting on behalf of all three partners. (Id., ¶¶ 39-40.) In March 2013, the partners continued discussions relating to the SEC award, and the discussions with the SEC relating to disclosing the identity behind the application – recognizing that this question would be determined by federal law in this circuit. (Tung Decl., ¶ 20 and Exhibit B attached thereto.)

In September 2013, the SEC confirmed a whistleblower award of $14.7 million based on the information they had provided to the SEC. (Complaint, ¶ 41.) Sears turned on his partners and refused to distribute to Tung and Kolodner their share of the proceeds, and advised them of his refusal in September 2013. (Id., ¶¶ 42-44.) Thereafter, in connection with Tung's efforts to get Sears to honor his agreements, Sears traveled to Chicago on at least two occasions, attending both a meeting in Chicago on October 25, 2013 and a subsequent meeting in Chicago on December 15, 2013. (Tung Decl., ¶ 22.)

## ARGUMENT

As set forth above, a substantial amount of material events took place in substantial connection to Illinois. Plaintiff works and lives in Illinois; the agreements and promises at issue were negotiated with Plaintiff here in Illinois; numerous communications were directed to and sent from Plaintiff here in Illinois; and the SEC action which was initiated based on the information jointly developed by the parties was filed and prosecuted here in Illinois, in a suit heard in this district before Judge St. Eve. In moving to transfer, however, Defendant focuses only on his own actions – suggesting that because *he* was not physically present in Illinois during phone

conversations with Plaintiff, and because *he* does not reside in Illinois, this action should be transferred elsewhere. That argument, however, ignores the applicable legal standards. As set forth below, Illinois is plainly a proper forum for this dispute given the numerous ties to the causes of action asserted and transfer is improper because Defendant has not come close to establishing that transfer is convenient for anyone other than himself.

## I.   The Motion To Transfer Pursuant to 28 U.S.C. § 1406 (a) Should Be Denied

In his Motion to Transfer Venue, Defendant first argues that transfer is appropriate under 28 U.S.C. § 1406(a) because this District is an "improper venue." That argument is at odds with both the facts and the Court's prior rulings. Venue is proper in this court so long as "a substantial portion of the events giving rise to [Plaintiff's claims] occurred in Illinois." See 28 U.S.C. § 1391(b).

Sears falsely asserts in his brief that "[a]lmost all of the actions arising from the Plaintiff's claims took place outside of Illinois." (Def. Brf. at 1 (Doc. 16).) This argument however focuses solely on his own actions, all of which Defendant admits involve only sitting at his computer and phone in Virginia. (Def. Brf. at 4.) In fact, as set forth above, the e-mails and phone calls that Defendant apparently is focused on were made to Plaintiff *in Illinois.* Illinois is where Plaintiff works and where he lives, and it is where he received telephone calls and e-mails from Sears. (Tung Decl., ¶¶ 3, 9, 11-12.) It is also where Plaintiffs conducted his efforts and work as they pertain to the underlying issues – engaging in the discussions that gave rise to the agreements at issue and investigating the actual site where ACCC was purportedly developing a convention center. (Tung Decl., ¶¶ 11, 12, 15.) Unsurprisingly, it is also where the underlying fraud by ACCC was investigated and prosecuted by the SEC. SEC v. Sethi, et al., Case No. 13-CV-982 (J. St. Eve.)

Sears' suggestion that this district is an improper venue because *he* wasn't physically present here does not make this District an improper venue.  As a court in this District has aptly noted, "The focus of [28 U.S.C.] § 1391 is the nexus between the facts and the cause of action, not the defendant and the cause of action."  Moore v. AT&T Latin Am. Corp., 177 F. Supp. 2d 785, 788 (N.D. Ill. 2001).

Indeed, the claim that the Northern District of Illinois is an improper venue has already been decided against him by this Court.  Sears previously filed a Motion to Dismiss for Improper Venue in which he asserted these exact arguments (Docket Entry No. 7, and attached as Exhibit B to Sears' present Motion to Transfer), which the Court denied.  Sears provides no serious basis for challenging the Court's prior ruling.  In the absence of any basis to find that venue is improper in this district, Defendant's Motion under §1406(a) must be denied.

## II.  **There is No Basis to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)**

In the alternative, Defendant seeks to transfer this action to federal court in Virginia.  In support of this claim, however, Sears fails to identify any other actions, witnesses or evidence that are located in Virginia, suggesting only that transfer will be convenient to him.  That provides no basis for granting his motion.

Transfer under Section 1404(a) is appropriate when: (1) venue is proper in both the transferor and transferee court, (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice.  Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Ass'n, Inc., 525 F. Supp. 2d 1039, 1044 (N.D. Ill. 2007).  While, as set forth above, venue is plainly proper in this court, and for purposes of this motion Plaintiff will not dispute that venue would also be proper in Virginia (since Sears resides there), neither of the other factors supports transfer.  The movant has the burden of establishing, by reference to particular circumstances, that the

transferee forum is "clearly more convenient." Coffey v. Van Dorn Iron Works, 796 F. 2d 217, 219-20 (7th Cir. 1986). That burden is not met here.

**A.      Plaintiff's Choice of Forum Should not Be Disturbed Because Transfer is *Not* Convenient for the Parties and Witnesses**

As this Court has noted, the "convenience to the parties and witnesses" is evaluated with reference to: (i) the availability and access to witnesses; (ii) each party's access to and distance from resources in each forum; (iii) the location of material events; and (iv) relative ease of access to sources of proof. Gilbert v. Amy's Kitchen, Inc., Case No. 13-CV-9004, Order dated Sept. 10, 2104 (J. Norgle)(N. D. Ill.), *citing* Research Automation, Inc. v. Schrader-Bridgeport Intl, Inc., 626 F.3d 973, 978 (7th Cir. 2010). Moreover, in making this determination, the Seventh Circuit has recognized that Plaintiff's choice of forum is typically given "significant weight" so long as the forum is the location of significant material events. See In re Nat'l Presto Indus., Inc., 347 F.3d 662, 664 (7th Cir. 2003). Under such circumstances, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Id.

***1.   This District is the Location of Significant Events, Entitling Plaintiffs' Choice of Venue to Significant Weight***

At the outset, Plaintiff's choice of forum – this District Court – should be recognized and given "significant weight," because a significant amount of relevant conduct occurred in Illinois. While Defendant asserts that Virginia is "a more convenient forum" because "all relevant conduct took place there" (Def. Brf. at 7), in fact (as has already been noted), the following conduct underlying this action occurred in this district:

(i)      John Tung conducted his phone calls and communications from his home office in Lake Forest, Illinois;

(ii)     John Tung was present in Chicago, Illinois when he personally visited and inspected the purported ACCC development site;

(iii)    John Tung was present in Chicago when he reviewed ACCC's prospective offering materials, in connection with the suspicion of fraud and SEC violations;

(iv)    John Tung was present in Chicago when he took photographs of the Chicago site to provide to the SEC;

(v)    Michael Sears directed his phone calls and email communications to Illinois, where John Tung was based, including their initial discussions as to the investigation efforts undertaken by each and subsequent discussions relating to Sears's discussions with the SEC on Tung's behalf;

(vi)    The SEC filed the suit from which the whistleblower award was generated in this District;

(vii)    the agreements and promises between the parties were negotiated with Plaintiff sitting in Illinois and accepted by Plaintiff in Illinois;

(viii)    the breach of the promise to pay John Tung was effected in Illinois; and

(ix)    Sears personally traveled to Illinois for two meetings with John Tung relating to these claims.

(Tung Decl., ¶¶ 2-3, 9, 11-12, 15, 17-22; Complaint, ¶¶ 20-24, 27-33, 34-41.)   Indeed, Plaintiff himself does not dispute any of this – expressly agreeing that John Tung took pictures while present in Illinois to provide to the SEC, and admits that he travelled to Illinois to meet with John Tung relating to their agreement.  (Sears Affid. (Ex. C to his Motion), ¶12.)   Since all of these material events took place here in Illinois, Plaintiff's choice of forum should not be disturbed.  See In re National Presto Indus., Inc., 347 F.3d at 664.

By contrast, very little occurred in Virginia. The only connection to Virginia accurately cited by Defendant is that (I) Michael Sears lives in Alexandria, Virginia, and (ii) Michael Sears made phone calls and email submissions (to Tung, in Illinois) from Virginia.  (Def. Brf. at 3, 4; Sears Affid., ¶¶ 2, 11.)  Indeed, while defendant claims that he also undertook several actions in China, it is not clear whether more of Sears's actions occurred in China or Virginia.  (See Def. Brf. at 3, 4; Sears Affid., ¶ 8.)  Defendant also asserts that the parties' other businesses are "located and operate in Virginia." (Def. Brf. at 7). That claim, however, is at best misleading.  While, as noted

above, both the GCMA and CARc businesses maintain a Virginia mailing address solely for mailing purposes, there is <u>no</u> physical office space in Virginia from which anyone works. (Tung Decl., ¶¶ 4, 6-7.) This argument is also irrelevant. At issue in this action is an agreement between Sears and Tung individually; their companies (CARc and GCMA) are <u>not</u> parties to this litigation.

### 2. *Convenience to the Parties and Witnesses Does Not Weigh in Favor of Transfer*

Nor does the location of and convenience to the parties and witnesses weigh in favor of transferring this case.

While Sears claims that "witnesses or evidence" are "likely" to be in Virginia, he has failed to identify one witness or to provide any elaboration as to the actual identity of any such witness or purported evidence located in Virginia. (Def. Brf. at 7.) In fact, Plaintiff believes there are only three (3) witnesses to the discussions and agreements at issue who can be expected to testify:

(i)     John Tung – the Plaintiff, a party witness, who lives in Illinois;

(ii)    Michael Sears – the Defendant, a party witness, who lives in Virginia;

(iii)   Michael Kolodner – a non-party witness, who is based in Cold Springs Harbor, New York, and who also worked out of his own office in New York at all relevant times.

(Tung Decl., ¶¶ 5, 9.) These three individuals are the primary witnesses to the facts and claims asserted: the investigation by these three of the suspected fraud being committed by ACCC, their discussions (all of which were by telephone and email) relating to each of their efforts and understandings, and the agreements reached and accepted relating to their joint efforts relating to the information developed and provided to the SEC, and their decisions thereafter to file a whistleblower award application.

The location of the two party witnesses, Tung and Sears, is at best a neutral factor. Plaintiff is located here in Illinois, Defendant is located in Virginia, and, as the Seventh Circuit has stated,

"merely shifting inconvenience from one party to another is not a sufficient basis for transfer."

Research Automation, Inc. v. Schrader–Bridgeport Int'l, Inc., 626 F.3d 973, 978 (7th Cir. 2010)

(citations omitted). With respect to the non-party witness, Michael Kolodner, he is located in Cold

Spring Harbor, New York. (Tung Decl., ¶¶ 5, 9.) His designation of a witness does not tip the

scale in favor of either forum. Because Mr. Kolodner is located more than 100 miles from both

Alexandria, Virginia and Chicago, Illinois, he will likely have to be deposed in New York and the

same difficulties in obtaining his appearance at trial will be presented whether this case is pending

in this District or in Virginia.

Finally, Sears does not suggest, nor could he, that the availability of documentary evidence

supports transfer. Given the need to copy and send documents, the location of documents outside

the district is not a substantial factor favoring transfer in any event. See Gueorguiev v. Max Rave,

LLC, 526 F. Supp. 2d 853, 858 (N.D. Ill. 2007) ("Documents outside the district can just as easily

be shipped or sent to Illinois" as to the requested district"), citing Rugamboa v. Rungenga, 2007

WL 317035, *2 (N.D. Ill. 2007) (location of records has no impact on transfer motion, unless

"extraordinarily voluminous or difficult to ship"). Moreover, Plaintiff expects to potentially seek

the production of emails and files from three sources – GCMA, Ramsey Whitworth (outside

counsel for GCMA), and the SEC. None of those documents are located in Virginia to Plaintiff's

knowledge. The requested documents from GCMA should cover no more than a two- to three-

year period, will be limited to electronic email collection, and are not expected to be difficult to

procure or ship. Indeed, Tung understands that Mr. Kolodner, located in New York, will handle

the response to any request for such electronic data. (Tung Decl., ¶ 24.) Any files from Ramsey

Whitworth will likewise be limited to records relating to the application made to the SEC, and Mr.

Whitworth and his law firm are located in Baltimore, Maryland. These documents too can just as

easily be shipped to Illinois as to Virginia. Plaintiff may also seek limited documents from the SEC relating to the Sethi action and the whistleblower application, and the SEC's offices are not based in Alexandria, Virginia. Moreover, the SEC initiated and prosecuted its action here in Chicago, and thereafter the whistleblower award was granted based on the prosecution here in Illinois and the successful recovery of funds made here in Chicago. Again, while it is therefore reasonable to believe that those records are already here in Illinois and maintained in connection with to the SEC action filed here in Illinois (Case No. 13-CV-982), such production can be "shipped just as easily to Illinois" from wherever they may be located.

**B.      Transferring This Action Would Not Be In the Interest of Justice**

The third prong of the Section 1404(a) analysis – the Court's evaluation of whether a transfer is "in the interest of justice" – pertains to the efficient administration of the court system. Gilbert v. Amy's Kitchen, Inc., Case No. 13-CV-9004, Order dated Sept. 10, 2014, at 2. Courts consider such factors as: (i) docket congestion and likely speed to trial in each district, (ii) each court's relative familiarity with the relevant law, (iii) the respective desirability of resolving controversies in each locale; and (iv) the relationship of each district to the controversy. Id.

Here, the first factor is neutral and does not weigh in favor of transfer, as the median times from filing to disposition for civil cases in both districts is under seven months (Northern District of Illinois (6.9); Eastern District of Virginia (5.6)). See Federal Court Management Statistics June 2014, U.S. District Courts, www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district-courts-june-2014 (Sept. 17, 2014). The next factor, each court's familiarity with the law, by contrast, decidedly weighs in favor of *keeping* the case in this Court, Plaintiff's chosen forum. Plaintiff's claims for breach of fiduciary duty, breach of implied contract, and promissory estoppel, are Illinois state common law claims. This District, sitting in Illinois, is often called upon to hear

and resolve state law claims, and presumably has more familiarity with Illinois law than does the district court in Alexandria, Virginia.[2]

Lastly, the "respective desirability of resolving controversies in each locale" again favors Plaintiff, as does "the relationship of each district to the controversy". Here, Plaintiff is a resident of Illinois and has asserted claims under Illinois law ultimately arising out of a fraud conducted in Illinois, giving Illinois a strong interest in resolving this controversy; Virginia has no such connection. In addition, this District is where the SEC prosecuted its underlying action (Case No. 13-CV-982, <u>SEC v. Sethi</u>), which was initiated in Illinois based on the information developed by the parties to this action and was the basis for the whistleblower award. Plaintiff also notes that the Department of Justice has since also filed a criminal case against Mr. Sethi in this same District. <u>USA v. Sethi</u>, Case No 14-CR-0485 (J. Lee).

In view of all these factors, it is clear that nothing other than Defendant's own desire weighs in favor of transfer to Virginia. A significant amount of material events took place in Illinois, entitling Plaintiff's choice of venue to significant weight and the interests of justice weigh in favor of keeping the action in Illinois. There are <u>no</u> witnesses in Virginia other than the individual Defendant, and there is <u>no</u> other evidence or documents located in Virginia. Given these facts, to transfer this action would be tantamount to letting Defendant's choice of forum be the deciding and only factor. Accordingly, this Motion should be denied as Defendant has failed to meet his burden of demonstrating that the Eastern District of Virginia is "clearly" more convenient than this District. <u>See Heller Fin., Inc. v. Midwhey Powder Co.,</u> 883 F.2d 1286, 1293 (7th Cir. 1989).

---

[2] This serves to distinguish these claims from those modeled after federal statutes, and addressed by this Court in <u>Gilbert v. Amy's Kitchen, Inc.,</u> Case No. 13-CV-9004, Order dated Sept. 10, 2014.

## **CONCLUSION**

For the reasons set forth above, Defendant's Motion to Transfer must be denied in its entirety.

Dated: September 18, 2014                                JOHN TUNG

                                                        /s/ Sharon Sirott
                                                By:  Sharon Doherty Sirott
                                                     John C. Martin
                                                     MARTINSIROTT LLC
                                                     30 N. LaSalle Street, Suite 2825
                                                     Chicago, IL  60602
                                                     312-368-9000
                                                     ssirott@martinsirott.com
                                                     jmartin@martinsirott.com

                                                     *Attorneys for John Tung*

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that she caused a copy of the foregoing to be filed using the CM/ECF system on September 18, 2014, which will cause copies of the same to be served on all counsel of record for all parties.

                                    /s/ Sharon Sirott

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN TUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 14-CV-4699 |
| | ) | |
| **MICHAEL SEARS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF JOHN TUNG
DATED SEPTEMBER 18, 2014**

I, John Tung, hereby declare and attest the following in support of Plaintiffs' Opposition to Defendant's Motion to Transfer Venue:

1.      My name is John Tung and I am the Plaintiff in the above-referenced action.

2.      I am a resident of Lake Forest, Illinois and have lived there since 1988.

3.      I have operated and co-managed GCMA and CARc as a 45% active member since 2002. I have always performed my work for GCMA and CARc from my home office in Lake Forest, Illinois.

4.      GCMA and CARc do not have any physical office space in Virginia or any other state, and did not have any corporate office space in Virginia or elsewhere in 2012 or 2013. None of the three Members of GCMA or CARc (which are myself, Michael Kolodner and Michael Sears) worked from or "through the offices of CARc and GCMA in Alexandria, Virginia," in 2012 or 2013 as there is no such corporate office.

5.      Michael Kolodner, a 10% partner and Member of GCMA and CARc, lives in New York and maintains his office space in Cold Springs Harbor, New York. He has always worked out of his New York office for GCMA and CARc.

**Exhibit 1**

6.      For a brief period of time in 2008-2009, GCMA did have office space in Virginia that was used by Michael Sears.  That office space was closed in 2009 to save costs and Michael Sears began working from his home office in Alexandria, Virginia.

7.      GCMA and CARc have an office mailing address, which is 600 Cameron in Alexandria, Virginia, which is used by the companies solely for mail delivery purposes – a "mail-drop" address.

8.      For the years 2012 and 2013, I have not met with Michael Sears in Virginia or been present in Virginia at any time.

9.      All three partners of the business – myself, Michael Sears, and Michael Kolodner – have at all times since 2009 physically worked from our respective home offices to conduct company business.  I use my home office in Illinois; Michael Sears uses his home office in Alexandria, Virginia; and Michael Kolodner maintains an office in Cold Spring Harbor, New York.

10.     No one other than Michael Sears works from Virginia or is located in or based out of Virginia.

11.     All of the partners' (myself, Mr. Sears and Mr. Kolodner) business phone calls, email communications, and any other communication can originate from any of the three partner's respective locations, and each of these communications and emails are then directed to and received by each partner in their respective home office.

12.     Email communications sent to me at my corporate email address (tung@gcmafunds.com) are directed to me at my home office in Lake Forest, Illinois.   The same is true for Michael Kolodner's emails.

13.     All three partners (myself, Sears and Kolodner) are active managers of the business, and all three partners have each filed federal tax returns annually as "active managers" of the business.   I am not a passive investor in GCMA or CARc, and hold an equal 45% share in the business to Michael Sears; Michael Kolodner is also not a passive investor.  Each of us has assigned specific duties and responsibilities in operating the companies.

14.     I was also an active participant in the developing, gathering and presenting the information regarding the ACCC Chicago Project's fraudulent activity to the SEC, and my conversations with Michael Sears and Michael Kolodner relating to these matters were not "casual conversations."  These important discussions on ACCC's marketing and suspected fraud were had to protect our business and GCMA's marketing efforts.  I did not deem them to be casual, and I do not believe Mr. Kolodner treated them casually either.

15.     With respect to the SEC matter and whistleblower award, Michael Sears directed his telephone and email communications to me at my office location in Illinois.

16.     In November 2012, the three partners – myself, Sears and Kolodner – continued to discuss the ACCC Chicago project and the scope of its fraud, given the effect it was having on GCMA's marketing strategy.  We discussed that Sears was going to contact the SEC on our behalf and report what we knew.

17.     I also physically viewed and took photographs of the alleged ACCC development site in Chicago, Illinois, near O'Hare Airport, which were a significant part of our investigation. Michael Sears was aware that I was making site visits and taking photographs, undertaken to advise the SEC "what *we* know" – that is, what myself, Michael Sears and Michael Kolodner knew. (Attached as **Exhibit A** is a true and correct copy of an email dated November 29, 2012 from M. Sears to J. Tung.)

18.     In visiting and photographing the site, all of my efforts were made in and around Chicago, Illinois.  From November 29 through December 1, 2012, I personally made several visits to the alleged site of the ACCC project, which located near 8201 W. Higgins Road, Chicago, Illinois.

19.     I also did additional research, including reviewing materials on ACCC's website, to identify the precise physical location being described by ACCC, all of which I undertook and completed from my office in Lake Forest, Illinois.

20.     Contrary to paragraph 12 of his affidavit, Mr. Sears communicated with me, in Illinois, prior to September 2013 regarding the SEC matter.  For instance, in March 2013, Mr. Sears sent an email to myself (directed to me in Lake Forest, Illinois) and Mr. Kolodner (directed to him in New York) to advise us on the status of ongoing discussions with the SEC.  (Attached as **Exhibit B** is a true and correct copy of an email dated March 26, 2013 from M. Sears directed to J. Tung.)  In this email, directed to me at my office in Lake Forest, Illinois, Sears shared with me our counsel's advice regarding the issue as to whether the SEC needed to disclose the identity behind our whistleblower application.

21.     After the SEC action was initiated, Sears, Kolodner and I continued our regular telephone discussions surrounding the SEC matter and our businesses.  I continued to be based out of my office in Illinois during this time.

22.     Michael Sears also personally met with me in Illinois on two separate occasions relating to our discussions on the SEC matters and his refusal to honor our agreements.  First, he met with me in person on October 25, 2013, and he again

met with me in person on October 25, 2013, and he again met with me in Illinois on December 15, 2013.

23.     The sole witnesses to the agreements, understandings and promises made between the three partners relating to the SEC investigation and documentation, as well as the whistleblower application filed on our behalf, are (i) myself, (ii) Michael Kolodner, who lives in Cold Spring Harbor, New York; and (iii) Michael Sears.

24.     Michael Kolodner is also a licensed attorney and his role includes some legal work for the companies.  I understand that Mr. Kolodner maintains responsibility for the network and server used by GCMA.  I also understand that if a subpoena for records is issued to GCMA or CARc for this litigation, Mr. Kolodner, located in New York, will be responsible for GCMA's response to that subpoena.

25.     No witnesses to these agreements or to the claims asserted in this litigation reside or work in Virginia, other than Michael Sears himself.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on September 18, 2014.**

_____

JOHN TUNG

**From:** msears@gcmafunds.com
**Date:** November 30, 2012 4:17:54 PM CST
**To:** "John Tung" <JSMB4@msn.com>
**Subject: Re: Chicago convention center**
**Reply-To:** msears@gcmafunds.com

Thanks

The SEC is investigating the offering and asked if we knew if "construction" had begun as the marketing material has announced.
Sent via BlackBerry from T-Mobile

**From:** "JOHN TUNG" <jsmb4@msn.com>
**Date:** Fri, 30 Nov 2012 15:30:48 -0600
**To:** Michael GCMA Sears<msears@gcmafunds.com>
**Subject:** Fw: Chicago convention center

If it is a teardown of several existing buildings, it would be a lousy location surrounded by pizza joints and small shops. Area is not great for what they are proposing.
JT

----- Original Message -----
**From:** JOHN TUNG
**To:** Michael GCMA Sears
**Sent:** Friday, November 30, 2012 3:25 PM
**Subject:** Chicago convention center

Michael:

It could be that the convention project site is a teardown of other buildings down the road a bit. However, there was no construction activity as I drove along the road over this stretch. No demolition was occurring and all buildings were standing and operating. The site pictures was the only empty and unbuilt site along the road from 9100 West Higgins to 7200 West Higgins.
JT

.

**From:** msears@gcmafunds.com
**Date:** November 29, 2012 3:48:28 PM CST
**To:** "John Tung" <tung@gcmafunds.com>
**Subject: Chicago convention center**
**Reply-To:** msears@gcmafunds.com

Dear John.

ASAP Could you look up their project's Web site to get the project's address. Do a drive by to see what's happening at the site. ie is there construction activity.
Take some pictures too.

Thanks.

M
Sent via BlackBerry from T-Mobile

**From:** msears@gcmafunds.com
**Date:** March 26, 2013 10:50:15 AM CDT
**To:** "M Kolodner" <mkolodner@gcmafunds.com>, "John Tung"
<tung@gcmafunds.com>
**Subject: Fw: Dodd-Frank Case; Call with SEC attorneys - PRIVILEGED
ATTORNEY-CLIENT COMMUNICATION**
**Reply-To:** msears@gcmafunds.com


Sent via BlackBerry from T-Mobile

-----Original Message-----
From: "Ramsay Whitworth" <RWhit@gebsmith.com>
Date: Tue, 26 Mar 2013 11:43:19
To: <msears@gcmafunds.com>
Cc: Gregory Arbogast<GArbogast@gebsmith.com>
Subject: Dodd-Frank Case; Call with SEC attorneys - PRIVILEGED
ATTORNEY-CLIENT COMMUNICATION

Michael,

I am happy to report that Mika and Patrick have agreed that they do not need to disclose
your identity as part of the Rule 26(a) disclosures. They did, however, caution that as
discovery progresses there may come a time when they feel compelled to disclose your

1

Exhibit B

identity. Patrick did not want to lock himself in on what circumstances could arise that would compel this, but he agreed that he will notify me and you of the potential disclosure well in advance of disclosure if such a circumstance occurs. One example might be if they disclose a document that you sent to them. If they can't obtain that document through any other source, then they may have to disclose you as the source of the document in order to authenticate it.

So, we won the battle, and maybe the war.

Attached is a memo that my new associate, Greg Arbogast, drafted regarding the issues. The issue is much more convoluted then we expected - especially because the SEC case is pending in Illinois, which is in the 7th Circuit. The 7th Circuit issued an opinion in 2007 regarding the predecessor to Dodd-Frank. The case is not directly on point, but the language used by the Court in dicta has created real problems for SEC attorneys evaluating there discovery obligations.

In my opinion, even if there comes a time in discovery where it is necessary to disclose the source of a document, or some particular information, so long as the SEC does not intend to introduce that particular document and/or the information that you provided in their case in chief against the Defendant, then there should be no compelling reason to disclose your identity. Stated another way, so long as the SEC can prove its case at trial without information or documentation received from you, then I believe they should be able to shield your identity. If, however, they need information obtained from you (as opposed to some other source) or documents that you sent to them, then the issue becomes more complicated and there could be a circumstance where they are compelled to disclose your identity. Let's cross that bridge later if we have to.

Please let me know if you have any questions.


Sincerely,

Ramsay M. Whitworth, Esq.
Gebhardt & Smith LLP
One South Street
Suite 2200
Baltimore, Maryland 21202
ph: (410) 385-5101
fx:  (443) 957-4325